UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
JUN 30 2008
JUN 3 0 2008
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No. 07 CR 799 |
| vs. ) | Judge Ronald A. Guzman |
| HUBERT CHOW ) | |

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant HUBERT CHOW, and his attorney, LINDA M. BABICH, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2. The indictment in this case charges defendant with conspiracy to knowingly and intentionally distribute and possess with intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of 3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2 (Count One).

3.  Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.  Defendant fully understands the nature and elements of the crime with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

5.  By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment. Count One charges defendant with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

### Factual Basis

6.  Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct under Guideline § 1B1.3:

Beginning in or about November 2004, and continuing until in or about April 2005, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, HUBERT CHOW, defendant herein, conspired with the co-defendants in this case and others to knowingly and intentionally possess with the intent to distribute and distribute controlled substances, namely, mixtures containing MDMA, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

In particular, in approximately November 2004, CHOW began to participate in the drug trafficking operation based on the north side of Chicago run by co-defendant Ivan Myint. In particular, as was known to CHOW, Ivan Myint distributed wholesale amounts of MDMA and marijuana to various drug dealers around the Chicago area. CHOW's activity for Ivan Myint included, among other things, storing wholesale amounts of MDMA for repackaging and distribution to Ivan Myint's customers, preparing MDMA for distribution to Ivan Myint's customers, accompanying Ivan Myint during MDMA transactions and such other tasks as Ivan Myint would from time to time assign to CHOW. CHOW would occasionally work with other members of Ivan's Myint's "crew," which included co-defendants Michael Cruz, Roberto Valdez (known to CHOW as "Rob") and Jerry Left (known to CHOW as "Jerry"). Michael Cruz was a Latin King gang member who proclaimed himself to be, and was recognized by Ivan Myint to be, Ivan Myint's second-in-command of Ivan Myint's drug trafficking crew.

In approximately December 2004, CHOW, at the direction of Ivan Myint, stored at his residence a portion of a load of MDMA pills that Ivan Myint had purchased from co-defendant Kenneth Luong (known to CHOW as "Ken" or "Kenny"), a Canadian-based drug trafficker. After receiving the MDMA, CHOW, again at the direction of Ivan Myint, distributed the MDMA pills to other persons. During in or about December 2004 and January 2005, at the direction of Ivan Myint, CHOW distributed approximately 4,000 MDMA pills to co-defendant Jerry Left with the understanding that Jerry Left, also a member of Ivan Myint's crew, would distribute those pills to Ivan Myint's drug customers.

On or about January 9, 2005, CHOW assisted Ivan Myint in the delivery of approximately 922 MDMA pills to an individual who, then unbeknownst to CHOW, was

cooperating source ("CS1") working with law enforcement. In particular, during the execution of a controlled delivery of the MDMA pills to CS1 that day, CHOW, at the direction of Ivan Myint, handed the approximately 922 MDMA pills to CS1.

Later in January 2005, Ivan Myint was arrested by federal authorities and charged with distributing MDMA. On or about January 25, 2005, CHOW attended a meeting at a Chicago fast food restaurant that was attended by Ivan Myint, Ivan Myint's wife, and several members of Ivan Myint's crew, including Michael Cruz, Roberto Valdez, Michael Myint and CHOW. At the meeting, Ivan Myint told the participants of his arrest and his plan to flee to Mexico, accompanied by Michael Cruz and Roberto Valdez. After Ivan Myint left for Mexico, CHOW continued to speak with Ivan Myint via cellular telephone about the on-going operation of the drug trafficking operation.

Also, soon after Ivan Myint fled to Mexico, Michael Myint called CHOW and instructed CHOW to drive Ivan Myint's Chevy Tahoe (which CHOW was then using) to the intersection of Grand and Damen in Chicago and leave the keys in it. CHOW understood that the purpose of this was to hide the Tahoe so it would not be seized by federal agents. CHOW did as he was instructed to do by Michael Myint, who thereafter took possession of the Chevy Tahoe.

In March 2005, CHOW visited Ivan Myint in Cuernavaca, Mexico. The primary purpose of the trip was to deliver $6,000 cash to Ivan Myint. Prior to the trip, CHOW had also wired approximately $5,000 to Ivan Myint in Mexico. CHOW wired the money to two false names that Ivan was using in Mexico. CHOW received those false names from either Ivan Myint or Michael Myint. Michael Cruz and Roberto Valdez were in Mexico at the time of CHOW's arrival. In Mexico, Ivan Myint gave to CHOW a drug ledger, namely, a list of

people in Chicago who owed drug debts to Ivan Myint. Ivan Myint further instructed CHOW to collect the money from each of the debtors and, after collecting the money, to go to Canada and deliver the money to Kenneth Luong, to whom Ivan Myint owed approximately $100,000 for past drug shipments. Ivan Myint wanted to pay a portion of his debt to Luong so that Ivan Myint could continue his drug trafficking operation while a fugitive in Mexico.

Approximately two weeks after returning to the United States on March 25, 2005, CHOW traveled to Canada to meet with Kenneth Luong. Kenneth Luong was unhappy because CHOW did not collect any drug proceeds to pay Kenneth Luong and Kenneth Luong expected to receive at least $50,000, approximately one-half of the money Ivan Myint owed to Kenneth Luong.

The amount of drugs that the government can prove to have been involved in CHOW's offense was approximately 1,199.83 grams of mixtures containing MDMA.

7. Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range for defendant:

After CHOW began to work for Ivan Myint, CHOW's primary jobs consisted of storing MDMA for Ivan Myint and delivering the MDMA to Jerry Left and Roberto Valdez for delivery to Ivan's customers. CHOW usually distributed the pills to Jerry Left and Roberto Valdez in amounts of 1,000. CHOW usually removed 25-50 MDMA pills for himself from each amount of pills that CHOW delivered to Jerry Left and Roberto Valdez. On occasion, CHOW also delivered smaller amounts of MDMA pills for Ivan Myint. Usually, Ivan Myint would set up the deal and have CHOW accompany Ivan Myint to the

deal as "security," meaning that CHOW's role was to act like Ivan Myint's bodyguard so that the buyer would not attempt to steal the MDMA. CHOW also collected drug debts from Ivan Myint's customers. Ivan Myint told CHOW that Ivan Myint was paying salaries to Jerry Left, Roberto Valdez and Michael Cruz of about $500 to $1,000 per week.

In approximately late December 2004, Ivan Myint informed CHOW that Sejin Oh and Thomas Man Lung Lo had been arrested and that Ivan Myint wanted to store MDMA at CHOW's residence. Ivan Myint then instructed CHOW to contact Michael Myint, who Ivan Myint said was then in possession of the MDMA pills. CHOW then called Michael Myint and arranged to meet Michael Myint at Michael Myint's condominium in Chicago. Inside the condominium, CHOW met with Michael Myint, who gave CHOW approximately 16,000 MDMA pills, which were in a shopping bag. CHOW then took the pills to his residence. The pills were separated into packages of 1,000 MDMA pills each.

A few days after the delivery of the approximately 1,000 MDMA pills to CS1, as described in the foregoing paragraph, Ivan Myint contacted CHOW and asked CHOW to meet with Ivan Myint, Michael Cruz and Roberto Valdez at a restaurant in Chicago. At the meeting, the four men agreed to complete a 10,000-pill deal with CS1. Ivan Myint instructed CHOW to prepare the 10,000-pill order for delivery to CS1. After CHOW prepared the approximately 10,000 pills for delivery, Michael Cruz came to CHOW's residence in order to get the MDMA pills. The pills were clearly visible through the clear plastic packaging. Michael Cruz instructed CHOW to wipe his fingerprints off of the clear plastic bags containing the MDMA pills. Michael Cruz also told CHOW that Ivan Myint was going to "front" the pills to CS1, meaning that he would provide the pills on consignment to CS1. Before Michael Cruz left with the MDMA pills, Ivan Myint called Michael Cruz and

told him that the deal was off because Ivan Myint thought the police were watching him.

At the meeting at the fast food restaurant at which they discussed Ivan Myint's plan to flee to Mexico, Ivan Myint told the group that he believed CS1, Sejin Oh and Jerry Left were each cooperating with the police. Ivan Myint also instructed CHOW to sell the remaining MDMA that CHOW possessed and that Michael and CHOW would be getting more MDMA and hydroponic marijuana from Kenneth Luong to sell. Ivan Myint did not say that he felt threatened into fleeing and he seemed to be on good terms with both Michael Cruz and Roberto Valdez during the meeting. In the parking lot of the restaurant, CHOW gave $700 in cash to help pay for the expenses to be incurred by Ivan Myint during his flight. CHOW learned that Michael Cruz had arranged for the car used to drive into Mexico. Later, during CHOW's visit to Ivan Myint in Mexico, Ivan Myint informed CHOW that the car was pulled over by a law enforcement officer in Texas and that, during the traffic stop, Ivan Myint gave to the officer Michael Myint's driver's license in order to avoid being arrested as a fugitive.

At the time Ivan Myint fled to Mexico, CHOW had sold about 9,000 of the 16,000 pills he had stored for Ivan Myint. At Ivan Myint's direction, CHOW then sold the remaining approximately 7,000 MDMA pills for $5 each to other people whom CHOW knew. CHOW then gave $25,000 of that money to Ivan Myint and kept $10,000 of the money for himself. Most of the money that CHOW transmitted to Ivan Myint was sent via Western Union.

During the course of the conspiracy, CHOW made multiple trips to Canada to deliver drug proceeds to Kenneth Luong as payment from Ivan Myint to Kenneth Luong for MDMA and hydroponic marijuana that Ivan Myint purchased from Kenneth Luong.

8. The foregoing facts in Paragraphs 6 and 7 above are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty and to identify statements made subject to Guideline § 1B1.8(a), and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

   a. A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $1,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least three years, and up to any number of years, including life.

   b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

b. **Offense Level Calculations.**

i. Pursuant to Guideline §§ 2D1.1(a)(3) and (c)(6), the base offense level is 28 because defendant's offense including relevant conduct involved approximately 1,199.83 grams of MDMA, which, pursuant to Guideline § 2D1.1(c) (drug equivalency table), is equivalent to approximately 599.915 kilograms of marijuana.

ii. Pursuant to Guideline § 3C1.1, a two-level increase is appropriate because defendant willfully obstructed the administration of justice with respect to the investigation and prosecution of the instant offense by knowingly rendering assistance to co-defendant Ivan Myint while Ivan Myint was a fugitive from justice so that Ivan Myint could continue his drug trafficking activity.

iii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        iv.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

        v.    Based on the evidence now known to the government, the parties agree, subject to the Court's approval, that Guideline § 5C1.2 is applicable, and that the Court shall impose a sentence without regard to any statutory minimum sentence, and the offense level shall be reduced by two levels, pursuant to Guideline § 2D1.1(b)(11).

    c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal zero and defendant's criminal history category is I.

    d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 25, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 57 to 71 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

    e.    Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions

upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

      f.      Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

12.    Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the

Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable Guideline range and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court.

14. If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable guidelines range, as set forth in the preceding paragraph, this Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 50 percent of the low end of the applicable guidelines range. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this plea

agreement.

15. If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1, to depart from the applicable guidelines range, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1.

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

## Presentence Investigation Report/Post-Sentence Supervision

17. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

18. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the

probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

19. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

20. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 799.

21. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the

United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

22. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

   a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

      i. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant

guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

    iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

  b.  **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward

departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

c.  Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Other Terms

23.  Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

### Conclusion

24.  Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

25. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

26. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

27.　Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _June 30, 2008_

_____　for PJF
PATRICK J. FITZGERALD
United States Attorney

_____
HUBERT CHOW
Defendant

_____
TIMOTHY J. CHAPMAN
Assistant United States Attorney

_____
LINDA M. BABICH
Attorney for Defendant